Constitution, and the laws and Constitution
of the State of New York, and Correction Law.

2. This action arises from a series of events,
beginning on or about August 25 2011 when
Plaintiff was brutally attacked by certain
of the named-Defendants at Otis Bantum
Correctional Center ("O.B.C.C") on Rikers Island,
East Elmhurst New York (the "Incident" or "Assault").

3. At the time of the assault, Plaintiff was
I pre-trial detainee awaiting trail, and only
nineteen years old.

4. To conceal the malicious assault, the
Assaulting Officers, defined infra, conspired with
Other named-Defendants to, amongst other things,
lodge a disciplinary infraction ("Infraction") against
Mr. Alli for a number of falsified offenses.

5. While I hearing was held (the "Hearing")
in connection with the infraction, the hearing
was riddled with due Process deficiencies, which
ran afoul of Mr. Alli's Constitutional rights,
the Policies and directives of the New York
City Department of Corrections (the "Department" or
"DOC") and the laws of the State of New York

6. As a consequence of these massive
breaches, Mr. Alli was confined to disciplinary
Segregation for 200 Days, during which time

2

Certain named Defendants Caused Plaintiff to
endure heinous Confinement Conditions and exhibited
deliberate indifference towards Mr. Alli's serious
medical needs.

7. As a result of these and other deprivations
described herein, Mr Alli suffered religious
discrimination, Physical and Psychological Pain,
discomfort and humiliation, including, but not limited
to Permanent and non-Permanent Physical injuries
Such as head Trauma, Staples to head, Brain damage,
Chronic headaches, Memory loss, Abrasions, lacerations,
and Contusions.

8. Mr. Alli Seeks monetary damages
(Special, Compensatory, and Punitive) against all
defendants in their official and individual
Capacitys.

9. Mr. Alli also Seeks to invoke U.S.C
Title 18 Section 241 against all defendants
in their official and individual Capacity.

10. Mr. Alli also Seeks the Paying of a fine
and the imprisonment of a sentence of no
less than one year and no more than Ten(10)
years. And Public disciplining and Sentencing
of assaulting officers. And such Other relief
as the Court deems just and Proper.

3

## JURISDICTION AND VENUE

11. Jurisdiction is Proper under 28 U.S.C §§ 1331 because Plaintiff seeks to enforce rights secured by 42 U.S.C §§ 1783, 1988. This Court also has jurisdiction over Plaintiff's state law and Correctional law claims.

12. Venue is Proper in this Court Pursuant to 28 U.S.C §§ 1391(b) and (c)

## DEMAND FOR JURY

13. Plaintiff hereby demands a trial of any and all issues Pertaining to this matter.

## THE PARTIES

14. Plaintiff Umar Alli is a united States Citizen. At all times alleged herein, Mr. Alli was a Pre-trial detainee in DOC Custody.

15. Defendants Officer Mundy, Officer Mccabe, Officer Harris, Officer Foster, Security Captain Thompson, Deputy Moore and John doe ("Assaulting Officers") were, at all times referred to

4

in this Complaint, uniformed Correction Officers Employeed by D.O.C and assigned to O.B.C.C. The assaulting officers used a malicious amount of excessive force without good faith or penological interest. The assaulting Officers were required to conduct their responsibilities in accordance with, departmental directives governing the use of force, Correction law regulations, fourth Amendments interests, fourteenth Amendment interests, and the minimum Standards established by the new York City Board of Corrections (" B.O.C "). At all times referred to in this Complaint, Assaulting Officers Acted with malicious intent, deliberate indifference and within the scope of their Doc employment and under color of state law. These defendants are each sued in their individual and Official Capacities.

16. Defendant Deputy RAMOS, ("Supervisory officer") at all times relevant hereto, Acting in the Capacity Of an agent, Servant and employee Of D.O.C and New York City within the scope of his employment And acting under color of State law Encouraged, Aided & Abetted and failed to intervene in Subordinate's Assaulting Officers Use of Excessive force. Defendant RAMOS

5

also aided and abetted in the unwritten yet deeply embeded long-standing unconstitutional Policy Practice and Law of useing excessive force against Detainees. Defendant Ramos is being sued in his individual and official capacity.

17. At all times relevant hereto, Defendant Captain medina (Adjudication captain) acting in the capacity of an agent, servant and employee of D.O.C. Is responsible in ensuring disciplinary hearings are held in accordance to DOC Directive 6500-R,B And all detainees receive fair trail without Due Process violations. Yet defendant violated Mr. Alli's Due Process clause of the fourteenth Amendment, Eighth Amendment, and minimum standards of D.O.C. Depriving life liberty and Property without due Process of law. Defendant Medina acted with deliberate indifferance disobeying the rules and directive govered by her position. Defendant medina directly Participated in the civil right and Due Process violation willingly Knowingly and intentionally. Defendant Medina act Caused Mr. Alli an atypical and significant hardship and Wrongful confinement of 236 days in disciplinary segregation. Resulting in

F₁

deprivation of Plaintiffs' Personal liberty and regular enjoyment of Prison life in general Population. Defendant Medina is being sued in her Offical and individual Capacity.

18 At all times relevant hereto, Defendant WARDEN Of O.B.C.C during the Prescribed times herein, Was responsible for the failure to Cease the deeply imbetled long standing Policy of, Assualting officer, and Supervisory Officials and Other Uniformed Officers, Using excessive force on Detainees' in Un-Camerad Area of the facility. Defendant Warden of O.B.C.C is also responsible for the care, Custody and Control Of Detaince's Confined to O.B.C.C. These responsibilities Were and are required to be conducted in accordance With the legal mandates applicable to DOC facilities, including but not limited to directives governing the Use Of Force, inmate access to medical Care, due Process and BOC Minimum Standards. At all times referred to in this Complaint, Defendant Warden Of O.B.C.C (John Doe) acted Within the scope of their DOC employment and Under color Of State law. Defendant is sed in the individual and Official Capacity.

7

19. Defendants Dora Schriro and Lewis Finkelman were at all times relevant hereto, the Commissioner and First Deputy Commissioner of DOC. Respectively Defendants Schriro and Finkelman are legally responsible for the Operation of all of the Department's facilities, including but not limited to the Selection, supervision, Promotion, training, and discipline of all uniformed and supervisory Staff and for the Care Custody, and Control of all inmates in DOC Custody. These responsibilities were and are required to be Conducted in accordance with the legal mandates applicable to DOC facilities, including but not limited to directives governing the Use of force, inmate access to medical care, inmate Grievance Procedures, and due Process and Boc minimum Standards. Both Defendants were aware of the Unwritten Policy of the Use of excessive force, Defendants were on notice and failed to discipline or remedy the actions. At all times referred to in this Complaint, Defendant Schriro and Finkelman acted within the Scope of their DOC employment and Under color of State law. These defendants are sued in their Individual and Official Capacities.

20. Defendant Florence Finkle was at all times referred to in this complaint, Deputy Commissioner of Integrity and Policy for the DOC. In this role Defendants Finkle was responsible for ordering and supervising the investigation of all Use of force incidents and for initiating recommendations for disciplinary action against Officers and Captains who engage in Misconduct. These responsibities were to be conducted in accordance with the legal mandates applicable to DOC facilities. At all times referred to in this Complaint, Defendant Florence Finkle acted Within the scope of her DOC employment and Under color of State law. She is Sued in her Official and individual Capacities.

21. Defendant Larry Davis, at all times relevant hereto, Was the Chief Of the Department and Was responsible for the Supervision, oversight, and discipline of Uniformed Security staff, including the Supervisory Security staff, in all department Jails, including O.B.C.C. These responsibilities Were to be Conducted in accordance with the legal mandates applicable to DOC facilities. At all times referred to in this Complaint, Defendant Davis acted within the scope of his DOC employment and under color of state law. He is Sued in his individual and Official Capacities.

9

22. Defendant Michael Hourihane was at all times referred to in this complaint Deputy Chief Of Department. As Deputy Chief Defendant Hourihane was responsible for monitoring and addressing all Operational, Safety and Security matters in DOC facilities, including O.B.C.C. These responsibilities included maintaining statistics on violence and violent incidents at DOC facilities and creating procedures to protect the personal safety of D.O.C. Staff and inmates confined in DOC custody. At all times relevant hereto, Defendant Hourihane acted within the scope of DOC employment and under color of state law. Defendant Hourihane is being sued in his official and individual capacities

23. Defendants Michael J. Regan, and Hildy J. Simmons were, at all times relevant hereto, Chair and Vice-Chair of the BOC, Respectively. Defendants Regan and Simmons were responsible for establishing and ensuring compliance with BOC minimum standards regarding conditions of confinement and comfined in all New York City ("NYC") Correctional facilities. These defendants were required to promptly investigate serious incidents, evaluate DOC performance, review complaints, or grievances and make recommendations concerning the same. At all times relevant hereto

10

defendants Regan and Simmions acted within the scope of their DOC Employment and under color of state law. The Defendants are sued in both the individual and Official Capacity.

24. Defendants Cathy Potler and Richard T. Wolf. ESQ Were at all times relevant hereto, Executive Director and Deputy Executive Director of the BOC respectively. These full-time DOC Employees were responsible for ensuring that health care, safety & security, and Uses of force within all facilities was maintained "at a level consistent with legal requirements, accepted Professional Standards and Sound Professional Judgment and Practice" Together, Defendants Potler and Wolf were responsible for monitoring the Compliance of all DOC facilities with these minimum Standards. At all time relevant hereto Defendants Potler and Wolf acted Within the scope of their DOC Employment And under Color of state law. These Defendants are Sued in their individual and Official Capacity.

25. Defendant Kennith T. Armstead Was, at all times relevant thereto Director of head Operation and a full time employee of B.O.C.

11

In this role, Defendant Armstead supervised the daily activities of the daily field representative who are required to canvas DOC facilities daily for purpose of monitoring compliance with BOC Minimum standards. In this role, Defendant Armstead was required to conduct frequent and targeted inspections of DOC facilities to identify and resolve known problems, including but not limiting to unjustifiable uses of force and conditions of confinement in breach of BOC Minimum standards. At all times relevant hereto Defendant Armstead acted within the scope of his DOC employment and under color of state law. Defendant Armstead is sued in his official and individual capacity.

26. Defendant City of New York ("City") is a municipal corporation, which, through the Department, operates a number of detention facilities, including the O.B.C.C. The City through its senior officials at the Central Office and in each facility, promulgates and implements policies including policy with respect to use, reporting and investigation of force employed by uniformed staff, inmate grievance procedures, due process and inmate access to

Medical treatment and other services mandated by local law and court order. The City is also responsible for the appointment, training, monitoring, supervision, hiring and conduct of all DOC Personnel including the Defendants herein. The City is being sued in its Official Capacity.

27. At all times relevant hereto, John Doe 1 through 6 were field representatives, serving as BOCs "Eyes and Ears" into City Jails. These six defendants were responsible for conducting site visits at all DOC facilities for the Purpose of documenting and investigating Prisoner and Staff complaints and unusual incidents. At all times referred hereto in this complaint, John Doe 1 through 6 acted within the scope of their DOC employment and under color of state law. These Defendants are sued in their individual and official capacity.

28. Defendants Armstead, Davis, Finkleman, Hourihane, Potter, Regan, Schiro, Simmons, Wolf, and Bames are herein collectively referred to as "Policy-Making Defendants."

29. Defendants Correctional Health Service, Prison Health Services employed by the City and working within the Department facilities, are at all times relevant here responsible

13

for the Providing and assuring adequate
medical care and treatment. Defendants
are also responsible to investigate any
and all medical complaints fully and
Provide the needed treatment and follow-
Ups. Defendants are responsible for all
conduct of medical Personnel including
but not limited to Doctors and nurse's.
Defendants Correctional Health Service and
Prison Health Service is Sued in Official
Capacity.

30. Defendant John Doe "7" was
Present during the malicious assault
within the O.B.C.C. Mini-Clinic and
aided and abetted in the covering up
of Said assault. Defendant John Doe "7"
was a Medical Personnel, whom witnessed
some of the malicious assault yet failed to
intervene. Defendant is being sued in both the
individual and Official Capacity.

31. Any and all individuals whom received
letters from Mr All was Put on notice of
Mr. All's Claims Yet failed to discipline, Sanction,
investigate, and or aided and abetted in the
Covering up of the Misconduct is being sued
in both individual and Official Capacity.

14

## NOTICE OF CLAIM

32. On or about September 5 2011, and within ninety days of the accrual of the claims stated herein, Plaintiff Umar Alli, served on the Comptroller of the City of New York a Notice of Claim Setting forth the time, place and manner in which his claims arose. More than 30 days have elapsed since the Plaintiff's Notice of Claim was served upon Defendant City and the matter has not been settled or otherwise resolved.

## FACTUAL ALLEGATIONS

33. The conduct engaged by the Defendants named herein was, at all times, subjectively and objectively unreasonable and in violation of Mr. Alli's clearly established Rights.

34. On August 25 2011, Mr. Alli became yet another victim of a Pattern of brutality against Detainee's in unmonitored portions of Departmental facility. The Pattern of Using excessive force and the Pattern of brutality within the Mini clinic of Punitive Segregation

facilities. (ex. G.B.C.C. + C.R.V.C.). Senior officials,
Policy making officials/defendants, the City,
and other high ranking DOC Officials are
aware of and tolerate of assaulting officials
and other insubordinate employees, whom
are inconsistent with formal Policy. These Practices
are so wide spreaded long standing and deeply
embedded they constitute unwritten Departmental
Policy. These Practices are "deeply entrenched"
in New York City Jails. See Jim v. Steward-
Bowden, 11-CV-4952 (PKC)(KNF)(challenging
excessive and unnecessary force in the mini-clinic
and confines of the Cell of Plaintiff in New York City
Jail also the cover up tactics of false infractions
and illegal disciplinary hearings.) Nunez v. City of
New York, No. 11-CV-5845 (LTS)(JCF)(S.D.N.Y. Aug 30, 2012)
(the sixth and most recent class action Challenging
the "Routine and institutionalized staff violence
against inmates" in New York City Jails); Ingles
v. Toro, No. 01-CV-8279(S.D.N.Y 2006)(Requesting system-
wide relief from excessive use of force in the City
Jails); Sheppard v. Phoenix, No. 91-CV-4148(S.D.N.Y July
10, 1998)(Challenging excessive use of force in the City's
Central Punitive Segregation Unit); Jackson v. Montemango,
No. 85-CV-2384 (E.D.N.Y. Nov. 26, 1991) (Challenging the same
Conduct in the Brooklyn house of Detention). Reynolds v. WARD,

16

No. 81-CV-1101 (S.D.N.Y. 1990) (challenging excessive and unnecessary force in the Bellevue Prison Psychiatric Ward); Fisher v. Ward, No. 89-CV-2108 (S.D.N.Y. MARCH 28, 1990) (challenging the same conduct in Oak M. Taylor Center, a Rikers Island Jail). In addition to these class actions Senior DOC Supervisors and Uniformed Staff have been repeatedly sued by inmates alleging beatings by staff and DOC sanctioned cover-ups. See e.g., Youngblood v. Baldwin, No. 06-CV-5782 (S.D.N.Y. July 22, 2009) (alleging a staff beating at GRVC resulting in skull laceration and broken nose); Rice v. New York City Department Of Corrections, No. 03-CV-582 (S.D.N.Y. Aug. 26, 2004) (alleging the beating of two inmates at GRVC resulting in collapsed lung and contusion hematomas, in one case, and neck and spinal cord injuries); Joseph v. New York City Department Of Corrections, No. 02-CV-9219 (S.D.N.Y. MAY 28, 2003) (alleging beat-up at GRVC Resulting in orbital fracture); See also Reynolds v. City of New York, No. 11-CV-621 (S.D.N.Y. Nov. 21, 2011); Williams v. City of New York, No. 09-CV-5734 (S.D.N.Y. Aug. 12, 2010); Lee v. Perez, No 09-CV-3134 (S.D.N.Y. March 12, 2010); Sherford v. City of New York, No. 09-CV-945 (S.D.N.Y. Oct. 22, 2009); Bennett v. City of New York, No. 09-CV-8000 (S.D.N.Y. May 18, 2009); Mull v. City of New York, No. 08-CV-8854 (S.D.N.Y. March 22, 2011); Diaz v. City of New New York, No. 08-CV-4391 (S.D.N.Y. March 24, 2009); Capa v. City of New york, No. 08-CV-2931 (S.D.N.Y. Jan 26, 2009)

14

Williams v. City of New York, No. 07-cv-1055 (S.D.N.Y. Sept 24, 2008) Cuadrade v. City of New York, No 07-cv-1191 (S.D.N.Y Dec 26, 2007) Scott v. City of New York, No. 07-cv-3871 (S.D.N.Y. Oct. 18, 2007)

35. At the time of the assault, Plaintiff was a Pre-trial detainee housed in the Punitive Segregation Unit Of O.B.C.C

36. All Punitive Segregation Units are governed by Special directives which sett forth the Procedure of any and all Conduct including but not limited to, the transporting of an detainee, the Openning Of a detainees Cell, and the openning of any area a detainee is within. Before any and all Punitive Segregation inmate is moved, transported, Or released from a closed ander locked area (Shower, Cell, Three Point Search Area, visit) he must be fully cuffed and Secured. This directive also includes fair expections to open an location without a inmate being fully secured in "Proper restraints" (Hand Cuffs)

Pre-textual Entry into Mr. Allis Shower Pin While in Punitive Segregation.

18

37. On or about August 25 2011 At approximately 11 Am Mr. All was in the Shower Pin, Pin Number 8. Each Shower is confined within a steel cage equiped with a "Cuffing Port" (A Slot Attached to the steel cage for the Purpose of Cuffing and uncuffing a inmate.)

38. At all times the shower cage must be locked and secured. No Inmate Can leave Out of the Shower cage without being Placed in Proper restraints. This Process of being Properly Placed in restraints is done VIA the Cuffing Port. Once a inmate is Complete taking a Shower he informs the Officers then said Officer comes and Cuffs said inmate through the Cuffing Port. Once the inmate is secured and Properly Cuffed then the Officer use's his Key to open the shower Pin then transport Said inmate Back to his cell location. This Process is used for the transporting to and from the shower Area / Shower Pin for any and all Punitive segregation inmate. This Process is described further in the departments rules and directives.

39. Any failure to follow said directive is Mandated forms of discipline.

19

40. During date of malicious assault Mr. Alli (whom is a Practicing Muslim was fasting and otherwise) to the holy month of Ramadan.

41. As a Participant of Ramadan Mr. Alli and all other muslims were allowed to store food in his cell used to break his fast, at night and or the morning.

42. While Mr. Alli was in the shower Deputy Ramos, Security Captain Thompson, and Officer McCabe conducted a routine tour of the top tier of 2 south, which was the housing area Mr. Alli was located within. A Routine tour is a tour of the housing area's Top and bottom tier and not a institutional Search.

43. Solely with the intent to harrass and disrupt Mr. Alli's religious Practices Deputy Ramos Singled out Mr. Alli's cell and ordered for it to be open without any legitimate reason.

44. Mr. Alli cell was entered and an officer threw away his food used for fasting and breaking fast.

20

45. Mr. Alli when was still in the shower was informed by another inmate, who's cell was on the top tier directed across from Alli's cell, that the officers threw out his food.

46. As a result Mr. Alli shouted to security Captain thompson inquiring why was his food trashed when Captain thompson stated to him Proxey that no food in a muslim inmates cell will be tampered with or thrown away.

47. Mr. Alli and Captain thompson got into a verbal dispute in which caused Deputy Ramos to state "he thinks he's tuff bring him out here and fucke him up... muslim always acting gangsta..."

48. In response to Deputy Ramos orders, officers McCabe came to Mr. Alli's shower pin and told Mr. Alli he has to get out of the shower. Mr. Alli informed him he just got in the shower, didn't bathe yet and will leave once completed.

49. Officer McCabe left from Mr. Alli's shower pin and went to converse with officer Tessa, Deputy Ramos, Deputy moore Captain thompson and others whom were present. after the competion of said

brief conversation, Officer McCabe
returned to the Shower Pin with
the same request for Mr. Alli to
go to his cell area. While McCabe talked
to Mr. Alli Officer resse and Deputy Moore
Came within Plain sight and spoke of
Cuffing Mr. Alli UP and "Slamming
him on his head" (Said Conduct happens
in Punitive Segregation Often, a Officer May act as
if a inmate is not Cooperating while being escorted
to a location, then he is slammed brutally By
the holding officer.)

50. Approximately the third time a officer
Came to Mr. Alli Shower Pin, was Officer Harris
who did so at the Command of Deputy Ramos.
Officer Harris then opened Mr Alli's Shower
Pin without Mr. Alli being Placed in restraints.
there was no legitimate Penological intent
in Officer Harris opening Mr Alli's Shower pin.
Said action was done in Violation of DOC/
O.B.C.C. Rules and directives.

51. Officer Harris opened Mr Alli's cell
with Malicious intent to Conspire in the
leading Brutal Assault.

THE BRUTAL ATTACK WITHIN
THE SHOWER PEN

52. While Mr. Alli Shower Pen was
Open the assaulting Officers formed
Preparing for the brutal & Malicious assault

53. The brutal battery began almost
immediately upon the openning of Mr. Alli's
Shower cage. Defendant Harris entered first,
followed by Defendants Deputy Moore, and
Captain Thompson.

54. Defendant Harris delivered the first
blow, a closed fist strike to Mr. Alli's
facial area. Captain Thompson then followed up
with the assault throwing closed fist, And
deputy Moore joined the assault repeatedly
bashing Mr. Alli in the head with a metal
walkie-talkie radio, which caused Mr. Alli
head to burst open. Said injury required
Staples to Mr. Alli's head.

55. At no time during said assault
was Mr. Alli assaultive, or showed any
conduct warranting said assault

56. In attempt to reveal the malicious
assault Mr. Alli managed to come out of the
Shower Pen onto the main top tier Company.

THE Brutal Assault On
The Top Tier

57. Directly in front of shower pin &
on the top tier Company/compound the assault
resumed.

58. Defendants Rosso, McCabe, Harris, Mundy,
Captain Thompson and deputy Moore
(not excluding any other defendant that
can be Placed at incident via video surveillance
system) Issaulted Mr. Alli on the top tier
Company

59. Once Mr Alli was on the top tier he
voluntarily laid on this floor to show no signs
of resistance, he also placed his hand behind
his back in the non threating Cuffing Position.

60. While on floor said defendants repeatedly
Kicked, Kneed, Stomped and Punched Mr. Alli.
Said assault can be reviewed in full
via video footage.

61. In addition to the Conduct of
the malicious assault Defendants
degrading and life threating Comments
demonstrates the malicious, sadistic, and Punitive
Motivation behind the attack.

24

The statements make it clear that the assaulting officer were not acting in good-faith or in attempt to restore order but rather for the sole purpose of violating Mr. Alli's Constitutional rights

62. Mr. Alli continuously stated he wasn't refusing and begged for the assaulting officers to stop, but the beating continued. Other inmates who were either in ear shot of Mr. Alli's screams for help and or had a direct view of the assault beckoned for officers to cease the violent attack.

63. After what was like twenty minutes off being assaulted on the Company Mr. Alli was then escorted to the Mini-Clinic of O.B.C.C

The Attack Resumes
In the Mini-Clinic

64. There are no cameras in OBCC Mini-Clinic. Nonetheless there's no Cameras within any Punitive Segregation Mini-Clinic. Despite Countless Complaints to the Policy Making Defendants and higher ups and a Countless Complaints against defendants Stated herein and other uniformed Correctional officials

that Officers frequently use this unmonitored space to physically and sexually assault inmates. No steps have been taken to correct this major loophole in Prison Security and inmate safety.

65. Mr. Ali Was escorted to the Mini-Clinic Drenched in blood With excessively tight hand cuffs and shackles

66. When Mr. Ali entered the mini-Clinic there was a "John Doe 7" Correctional Officer sitting at the desk whom head seen and aided and abetted to Conspire and or failed to report said malicious assault

67. In addition to John Doe 7 There was also another inmate whom was within the mini-Clinic being treated by a male nurse/male doctor. Said nurse is stated herein as John Doe 8. Said John Doe "8" Defendant Was rushed out of the mini-Clinic along with the inmate whom was being treated, yet as Said defendant was leaving he witnessed Some of the malicus assault Yet failed to intervene and or report said misconduct.

68. While within the Mini-Clinic Officers Mundy, Harris, Besse, Captain Thompson and Deputy Moore took turns brutally stomping, kicking, kneeing and Punching Mr. Alli. Officer Mundy Continuously hit Mr Alli with a Metal garbage Can with intense force

69. Each Officer took turns assaulting Mr. Alli While the encourage each other in there life threating rants.

70. Mr. Alli was handcuffed and Shakled throughout the entire incident. After being Maliciously assaulting for Minutes on in, Said Officers Ceased Said Assault. Then Mr. Alli was seen by medical Personnel who requesting my Alli be sent to an Outside hospital in light of his extreme injuries.

71. At Cast Elmhurst hospital Mr Alli was treated for his multiple injuries including but not limited to head trama with required Staples. See Cast Elmhurst Medical report for full 1st of details of injuries.

72 days after the assault and even Months Mr. Alli was Denied Appropriate Medical Attention

Mr. Alli was DENIED
APPROPRIATE MEDICAL ATTENTION

73. The BOC's Minimum Health Care Standards ("MHCS") require that inmates receive Prompt Medical attention and explicitly Prohibit delay, denial and interference with an inmate's access to Medical treatment.
74. Inmates in need of emergency Services are to be granted access to such Services Promptly. In addition, Such Services are to be Provided Competently and "at a level Consistent with legal requirements, Accepted Professional standards and Sound Professional Judgment and Practice." Minimum standards § 3-01(A)
75. The Care Mr Alli received immediately after the incident and in the Several Weeks and/or Months that followed fell grossly below this standard
76. After the assault Mr Alli was denied and/or didn't receive adequate Pain Medication for His extreme Pain and discomfort.

28

77. In addition, despite being in extreme Pain, the examining doctor, facility Sick Call nurse/doctor whom routinely tour Mr. Alli's housing area and or the doctor whom reviewed Mr. Alli's hospital reports failed to follow Prior reccomendations, Prescribe Adequate medication and Schedule follow-up appointments.

78. Mr. Alli didn't receive any wound Care and or as requested further investigation into the claimed injuries due to the head truma

79. Had Mr. Alli received a Proper exam, treatment and follow-up Care, as required Under NHCS the Permanent injuries he Sustained would Surely have been Minimized or treated before they Wrestened.

Defendants Demonstrated Deliberate Indifference To Mr Alli's Need
        For Medical Care

80. In the months following the assault, Mr. Alli was denied access to necessary Medical treatment Causing him to Suffer Permanent Physical injury Proximately related to the attack.

29

81. During his disciplinary Segregation Mr. Alli made daily request to be seen by sick-call Personnel, all of which were ignored.

82. For instance, Mr. Alli made daily request for medical Care to Prison Health Services/ Correctional Health Services, aswell as Officers Captains and deputy's during their frequent tours or Mr. Alli's housing area.

83. Said defendants were responsible for the discipline, supervision monitoring and training and or Providing or directing medical treatment be Provided. But failed to Order or otherwise facilitate Mr. Alli's acess to Medical treatment.

84. Upon information and belief, Defendants John Does 1 through 6 Canvased O.B.C.C during said time Period but failed to document report investigate, remedy or other wise facilitate or intervene in Protection of mr Alli's Constitutional rights

85. The Joint and Conspirational action of defendants stated herein constituted deliberate indifference to a Substantial risk Posed to Mr. Alli's health and safety and fell short of DOC and BOC directives, Policies and Standards.

30

86. Mr. Alli also submitted medical complaints to the Policy-Making Defendants some of which were not answered and or remedied.

87. In attempt to cover-up the unwarranted and malicious assault defendants intracted Plaintiff for disciplinary offenses.

THC Infraction And Corresponding
Cover-UP Disciplinary Hearing Violations

87. The infraction was the first of a series of events intended to cover-up the initial wrongful act, namely the malicious assault on Mr. Alli.

88. The infraction, as required under DOC policy, triggered an investigation. This investigation was however, laced with inefficiencies, bias and due Process violations.

89. Adjudiacation Captain Medina violated Plaintiffs fifth, Eighth and fourteenth amendment of the Constitution, as well as DOC's/BOC's Minimum Standard, Due Process, Correction Law, and the rules/laws of D.O.C/B.O.C including but not limited to directive 6500 B.B.

31

90. Defendant Medina acted with deliberate indifference violating all rights and laws stated herein by not following the rules Policies and directives her Positioned is governed by.

91. Defendant Medina willingly, knowingly and intentionally violated due Process rights and DOC/BOC Directives By; Denying Wittness, concreting outside information, allowing inconsistent statements without question. Defendant Medina declined to question assaulting Officers regarding inconsistences and Omissions in their reports, including the attack in the Mini-Clinic.

92. Instead, despite Mr. Ali's assertion that he had been further assaulted in the Mini-clinic following the Prior assault within the shower and on the tier.

93 Prior to the hearing, Adjudication Captain Medina failed to review the intraction for due Process Violations and failed to investigate and report Mr. Ali's Allegations of excessive force. In fact, when Mr. Ali informed Defendant Medina Of the assault in the Mini Clinic, she failed responded that it did not Concern her, she discounted those allegation because the Mini-Clinic assault was not mentioned

32

in assaulting officers report.

94. Defendant Medina similary failed to review and/or facilitate the preservation of video evidence capturing the assault, and denied and or delayed causing prejudice to obtaining witness and the opportunity to call and examine witnesses during the hearing, even though these witnesses would have offered material non-duplicative evidence.

95. In addition John Doe "9" the investigating Captain of the incidents failed to carry out the mandates as prescribed by DOC/BOC Policy law and directives. Said defendant aided and abetted in the covering up of the malicious assault. The infraction, as required under DOC Policy triggered an investigation this investigation was, however laced with inefficiencies, bias and violated due process. John Doe 9 failed to conduct an investigation within 24 hours of incident as mandated, failed to investigate Mr. Alli's position of the incident before the disciplinary hearing, failed to obtain statements from material witness.

96. As a result of Adjudication Captain Medina and John Doe 9 Conduct as well as the assaulting Officer whom forged the infraction Mr. Alli

received a disposition of guilt to the charges within the infraction for the sentencing of about 236 Days in Punitive Segregation.

97. this Confinement is Wrongful and could have been avoided if Adjudication captain Medina followed the rules, plus Policies, and directives of the Department of Correction and United States Constitution.

98. This wrongful confinement could have been avoided if all defendants herein would have been properly Supervised, trained and or disciplined by the City and Policy Making defendants.

99. All higher ups, the City and Most of the Policy Making Officials knew of or Should've knew of Adjudication Captain Medina extensive history of Violating inmates rights during disciplinary hearings. Said defendants knew of Medina being insubordinate yet failed to re-train or remove her from Conducting disciplinary hearings.

## LOST OF LIBERTY DURING PUNITIVE SEGREGATION SANCTION

100. Plaintiff Elmar Ali a Pre-trail detainee had a liberty interest to avoid Punitive Segregations and deprivations of Normal Prison life.

34

101. During Stated wrongful Confinement Mr. Aiti was subjected to the continuous of ordinary Prison life deprivation. These Changes resulted into loss of liberty, loss of amenity and mental/emotional distress.

102. Plaintiff was confined for 23 hours a day in a very small square cell equiped with a toilet directly need to the cell door window. Most inmates and officer could see inside Plaintiff's cell when he was useing the toilet.

103. Plaintiff was deprived of most of his Personal Property for example, supportive footwear, books, Magazines, Personal Clothing, time Piece, Cosmetics, Stamps, envelopes, Personal Pictures, religious items and Canteen/comminsiary. As well as the ability to work, attend educational and vocational Programs, watch television, associate with Other detainee's attend Outdoor or indoor recreation in a Congregational setting, with the ability to engage in sports and other congregate recreational activities.

104. Plaintiff was deprived the ability to attend meals with Other detainees, and forced to eat food that was often

35

Cold and wall under mandated Portions.

105. During Court appearances Plaintiff was hand cuffed and schakled for the Minimal of Cight hours, and forced to appear in front of the Jeidge in Punitive Segregation Clothing and restainted in hand cuffs and Schackles.

106. Plaintiff was often denied the ability to shower, yet only one shower was given a day in a shower cage that Individuals whom passed could see in. No shower curtains was Permitted for Punitive Segregation.

107. Mr Alli was effected in the adequate research in the issues reveaving his Criminal Case due to the limited law library access. Plaintiff was not Permitted to go to law library yet forced to Submitt his request on a Paper which Often went unanswered.

108. Plaintiff was also subjected to One six (6) minute Phone call a day, in which same day he wasn't able to contact his family freinds and or loved ones.

109. The above stated Consituted atypical and significant hardship, loss of liberty and deprevation of Ordinary Prison life.

Defendants Conduct Egregiously
Violated DOC and BOC Policies & Directives

A. Use of force Directive

110. The Department has implemented use of force Directive No 5006R. Under this directive, force is to be used only after all reasonable efforts to resolve a situation has failed

111. Correctional officers and DOC Staff are Permitted to use force commensurate to the level of threat Posed by the inmate at that time. This directive mandates that "blows Should not be Struck if control holds, grasping or other less harmful Methods" would be adequate to "restrain the inmate"

112. Assaulting officers took no means in following this directive and used conduct of force to Punish or harm Mr. Ali.

B. Health Care Minimum Standards

113. The BOC has established Minimum Standards Pertaining to inmate access to Medical Care.

114. Medical Care within Dot facilities is to be maintained "at a level Consistent with legal requirements, accepted Professional

37

accepted Professional Standards and Sound Professional Judgment and Practice "

115. These standards contemplate (i) the Provision of Prompt Medical treatment and follow-up Care as well as emergency Services; (ii) the regular training and development of health Care Personnel and Correctional Staff as appropriate to their role in the health Care delivery system; and (iii) an ongoing review and assessment of the quality of Care Provided to detainees.

116. In addition, these Standards expressly Prohibit DOC Staff, Officers and Personnel from delaying, denying or otherwise interfering with an inmate's access to Medical Attention.

117. DOC officers with Knowledge Of an inmate's need for medical Care are to report Such need Promptly.

118. To the extent appropriate treatment for an inmate's injuries are not available within the correctional facility, these standards mandate that specialty Services be Provided to inmate in the time frames specified by referring medical Personnel. In addition all decisions regarding medical Attention are to be made by health Care Personnel Only and Sick Calls are to be available to inmates everyday within 24 hours of a request for care

C. Due Process Directive

119. The Department has implemented Inmate Disciplinary Due Process Directive No. 6500R-B

120. This directive requires that DOC enforce its rules and regulations "fairly and in accordance with due process requirements", and sets forth the process for investigating disciplinary Misconduct in DOC facilities. The investigation process begins with a report and notice of infraction ("RNI") to be prepared whenever" an employee reasonably believes an inmate violated an institutional or Departmental Rule" The RNI is to be "legible, detailed, and specific regarding time and place of the Rule violation(s) and Shall include the description of the inmates actions and behavior," The investigation is to be conducted by a supervising officer who neither participated in or witnessed the subject-incident and is to commence within 24 hours of the incident.

121. Directive No. 6500 R-B instructs that an Infraction be dismissed for due process violations, including but not limited to, failure to commence the investigation within 24 hours, as well as the inclusion of contradictory, incorrect and/or inconsistent allegations

122. This directive requires that Use of Force allegations by the infracted inmate be reported and that all relevant evidence be reviewed by the adjudication Captain who is then instructed to make a determination as to "why and where injuries were inflicted on the inmate,

123. This directive further requires that any allegation by the infracted inmate or "Abuse of Authority, Malfeasance or Corruption on the Part of (DOC) Personnel ... be reported in writing directly to the Inspector General's Office

124. Significantly, this directive states in No Uncertain terms that witnesses requested by the infracted inmate "Should be Called" in accordance with relevant Procedures Unless Unavailable.

125 After a complete reviewing of the Directive 6500 R-B and diciplinary hearing transcript it is undisputed that Plaintiff rights were violated in accordance to stated directive and federal clause of Due Process.

EXHAUSTION OF ADMINISTRATIVE
REMEDIES

40