UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

Umar Alli,

                                    Plaintiff,

  -against-

City of New York, Officer Moore, Officer Ramos,
Officer McCabe, Officer Harris, Officer Mundy,
Captain Thompson, Captain Medina, Officer Reese,
Warden of OBCC, Dora Schriro, Hildy J. Simmons,
Michael D. Regan, Kenneth T. Armstead, Florence
Finkle, Lewis Finkleman, Michael Hourihane and
John/Jane Doe Officers 1-9,

                                    Defendants.

------------------------------------------------------------------ x

**FIRST AMENDED
COMPLAINT**

Jury Trial Demanded

No. 14 Civ. 6597 (AT)
(KNF)

<u>PRELIMINARY STATEMENT</u>

In this case, Plaintiff Umar Alli alleges that the New York City Department of

Corrections ("NYC DOC") and its employees violated his rights on various occasions

while he was in their custody.

**<u>NATURE OF THE ACTION</u>**

1.      This is an action to recover money damages for those rights violations

arising from the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the

United States Constitution.

1

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

3.      This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

5.      Plaintiff demands a trial by jury in this action pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

6.      At all times relevant to this action, Plaintiff Umar Alli was in the care and custody of the New York City Department of Corrections ("NYC DOC") at Rikers Island.

7.      Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.      Defendant City of New York maintains the NYC DOC, a duly authorized public authority and/or corrections department, authorized to perform all functions of a corrections department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

2

9.      Defendants Officer Moore, Officer Ramos, Officer McCabe, Officer Harris, Officer Mundy, Officer Reese, Captain Thompson, Captain Medina, and John/Jane Doe Officers 1-9, all individually, were at all times relevant duly sworn corrections officers, employees and agents of the NYC DOC and were acting under the supervision of said department and according to their duties.

10.     Defendants OBCC Doe Warden, Dora Schriro, Michael D. Regan, Kenneth T. Armstead, Florence Finkle, Lewis Finkleman, Michael Hourihane and Richard T. Wolf, all individually, were at all times relevant duly sworn employees of New York City Corrections and were acting under the supervision of said department and according to their duties.

11.     At all times hereinafter mentioned Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York and/or the City of New York.

12.     Each and all of the acts of the Individual Defendants were done by said Defendants while acting within the scope of their employment by Defendant City of New York.

## STATEMENT OF FACTS

13.     At the time of the incident Plaintiff was nineteen years old and a pretrial

detainee in Defendants' custody in the OBCC facility on Rikers Island.

14.     On or about August 25, 2011, Plaintiff, a practicing Muslim, was fasting in observance of Ramadan.  A NYC DOC religious accommodation allowed him to keep food in his cell so that he could break fast when permitted.

15.     Plaintiff was on enhanced-restraint status at the time, a designation which, among other things, required that Defendants transport him within their facilities according to special directives.  For example, detainees are housed in units with ubiquitous "cuffing ports" so that corrections officers and detainees only interact with one another when the detainee is cuffed.

16.     On the date of the incident, Defendants placed Plaintiff in a shower pin while cuffed, then removed the cuffs using the cuffing port so that Plaintiff could bathe.

17.     Meanwhile, Defendant Officer Ramos, Defendant Officer McCabe and Defendant Captain Thompson conducted a routine tour of Mr. Alli's housing area which did not involve a systematic search of cells.

18.     Defendant Captain Thompson was a regular presence in the housing unit; knew about the break-fast accommodation that had been provided to Mr. Alli; and had represented to practicing Muslims in the housing unit, including Mr. Alli, that their break-fast food would not be tampered with or taken.  Indeed, by August 25, 2011, the housing unit inmates who observed Ramadan had had this accommodation

for nearly a month, as Ramadan would end on August 30, 2011.

19.     While on the housing area walk through, Defendants Ramos, McCabe and Thompson, who knew that Mr. Alli was a practicing Muslim, entered Mr. Alli's cell and, without any articulable reason, seized from him the food that accommodated his observation of Ramadan.

20.     Mr. Alli was still in the shower pin when this happened.   However, another inmate in his housing unit called out to him that he had just seen Defendants remove Mr. Alli's break-fast food.

21.     Mr. Alli then called out to Defendant Thompson, who was within earshot and with whose cooperation the break-fast food accommodation had already been in effect, and Mr. Alli asked him whether and why his break-fast food had been seized and destroyed.

22.     Defendant Thompson confirmed that Defendants had taken and destroyed the food.   Mr. Alli protested that the seizure of the break-fast food was not right.

23.     Defendant Ramos took offense to Mr. Alli's questioning of the seizure of the break-fast food.   Defendant Ramos interjected, in sum and substance, that if Mr. Alli thought he was so "tough, bring him out here and f*** him up . . . Muslims [are] always acting gangster."

24.     Defendant McCabe materialized at the gate to the shower pin to cuff

Plaintiff at the cuffing port.  In that moment, Mr. Alli was still standing under the shower water.  Defendant McCabe, seeing that Mr. Alli was not dry and ready for transport, walked away.

25.     Defendant McCabe then returned with Defendant Officer Reese and Defendant Officer Moore in tow, and Defendants said, in sum and substance, that after they cuffed Mr. Alli they would "slam him on his head."  At the time Defendants made this statement, Mr. Alli had during his time in DOC custody already observed Defendants employ purportedly accidental drops of handcuffed inmates as a method of unjustified punishment for delays or inconveniences caused ("Drop").

26.     Suddenly Defendant Officer Harris unlocked and opened Mr. Alli's shower pin without first cuffing Mr. Alli.  On information and belief, Defendants already intended to assault Mr. Alli, and knew that they would need to have him uncuffed in order to reasonably claim that he had taken done something to justify their use of force upon him.

27.     Defendant Harris entered the shower pin, followed by Defendant Moore and Defendant Thompson.  Defendant Harris hit Plaintiff in the face with a closed fist, then Defendant Moore struck Plaintiff in the head with a walkie-talkie.  The walkie talkie blows caused Plaintiff's head to split open, a wound that later had to be closed with staples.

28.     At some point, Defendants' assault caused Plaintiff to fall out of the

shower pin altogether and towards the adjoining housing area.

29.     Now that Plaintiff had fallen into a more open area, Defendant Officer Reese, Defendant Officer Mundy and Defendant Captain Thompson joined in the use of force against Plaintiff.  Plaintiff was kicked, kneed, stomped and punched.

30.     Insofar as Plaintiff never physically assaulted Defendants at any point, no part of Defendants' use of force against Plaintiff was justified.  Plaintiff begged Defendants to stop hurting him as they hit and kicked him, and inmates who observed the unjust use of force also began to call out to Defendants to stop. Defendants' use of force continued and as if the fact and extent of it did not alone show that Defendants acted with malicious intent to hurt Plaintiff, Defendants demonstrated their malice even further by insulting and threatening Plaintiff as they hit and kicked him.

31.     Defendants finally stopped and took Plaintiff, handcuffed, shackled and bleeding, to OBCC's mini-clinic.  When Plaintiff entered the mini-clinic, there was a John Doe Officer on desk duty who failed to intervene with respect to the unjustified use of force ("John Doe Desk Officer").   Doe Defendant Desk Officer never reported the incident and never presented himself as a witness later.

32.     Another John Doe in the clinic was tending to an inmate ("John Doe Nurse Officer").  Defendants hustled these individuals out of the mini-clinic, but not before John Doe Nurse Officer observed Defendants' hostile treatment of Plaintiff

and his serious injuries.  John Doe Nurse Officer never reported the incident and never presented himself as a witness later.

33.     Defendants continued to strike Plaintiff even in the mini-clinic, at one point with a metal garbage can, and the taunts continued.  Eventually Defendants called medical personnel to see Plaintiff, and Plaintiff was taken to East Elmhurst Hospital for treatment of his injuries, which included head trauma and a head wound requiring staples.  Hospital doctors took note of Plaintiff's serious injuries and prescribed pain medication and follow up treatment.

34.     Once Plaintiff returned to OBCC, he made extremely regular (at times daily) sick-call requests.  John/Jane Doe Correctional Officers who regularly toured Plaintiff's housing were deliberately indifferent to Plaintiff's serious medical needs. These serious medical needs were known to them not only because of hospital doctors' instructions and diagnoses, but because Plaintiff had physical manifestations of those needs—visible head wounds, lacerations, abrasions and contusions—which (1) corroborated the hospital doctors' instructions and diagnoses, and (2) corroborated Plaintiff's own complaints.  The nature of Plaintiff's serious medical needs, for example, the visible and large head wound, was such that a reasonable person would have known that a substantial risk of serious harm came with it.   Even still, Defendants' indifference forced Plaintiff to endure weeks of needless pain and worry.

35.     In order to get the medical treatment he so badly needed, Mr. Alli wrote and sent numerous letters each to various individuals in positions of some power and/or authority working in City Corrections, pleading for them to look into the matter.  Mr. Alli paid particular attention to individuals whose positions dealt with policing rights violations and integrity problems within the DOC facilities.   For example, he wrote to Defendant Dora Schriro, then Commissioner of the NYC DOC; Defendant Hildy J. Simmons, then a member of the NYC BOC; Defendant Michael J. Regan, then a member of the NYC BOC; Defendant Kenneth T. Armstead, then Director of Field Operations at the NYC BOC; Defendant Florence Finkle, then a deputy commissioner in charge of internal investigations at Rikers; Defendant Lewis Finkelman, then a deputy commissioner at the NYC DOC; Defendant Michael Hourihane, then Chief of the NYC DOC; and Defendant Richard T. Wolf, then deputy executive director of NYC BOC ("DOC and BOC Defendants").

36.     Mr. Alli also wrote and sent letters seeking help to the OBCC Warden at the time ("Warden Doe Defendant").

37.     Despite Mr. Alli's written pleas to DOC and BOC Defendants and Warden Doe Defendant asking that they intervene to aid in the violations of his rights, DOC and BOC Defendants and Warden Doe Defendant, having received actual notice of the constitutional torts being committed, failed to remedy the wrong.

38.     Importantly, Mr. Alli did not just provide Defendants notice of the constitutional harm he suffered in the context of the excessive force, where Defendants may not have been able to remedy the wrong after the fact, but in the context of the ongoing violations relating to due process and indifference to his serious medical needs.  In these latter realms Defendants certainly had opportunity to remedy the wrongs as they constituted a continuing violation, yet no action was taken by Defendants, despite their having actual notice, nor, on information and belief, did they dispatch someone to investigate in the field as their offices enabled them to do.

39.     Defendants wrote a false infraction against Plaintiff in the aftermath of the assault.  For all the reasons alleged herein, Defendants intended for the false allegation that Plaintiff committed some infraction against them to provide a basis for them to argue that they were justified in using force against Plaintiff.

40.     One of the Doe Officers was assigned to provide an independent investigation into the infraction, then give the case to Defendant Captain Medina, who was appointed the adjudication captain tasked with providing Plaintiff due process in the context of a disciplinary hearing arising from the fabricated infraction.

41.     Doe Adjudication Captain and Defendant Captain Medina violated Plaintiff's process rights in their performance of their work.  As one example, Defendants denied Plaintiff his requested material witnesses (for example, the inmates who were eyewitnesses, the John Doe Desk Officer who witnessed the clinic assault,

and John Doe Nurse Officer).  As another example, Defendants took testimony from various Individual Defendants but ignored credibility problems that no reasonable person would have ignored, i.e., greatly diverging versions of events that could not square with one another.   Defendants focused their attention on Defendants' allegation against Plaintiff, without seriously considering Plaintiff's allegation that the infraction was a cover up, despite Plaintiff's grievous injuries and the fact that the Individual Defendant Officers did not have injuries.

42.     Defendant Captain Medina substantiated the infraction and sentenced Mr. Alli, a teenaged pre-trial detainee, to 236 days in punitive segregation.  During that period, Plaintiff endured atypical and severe hardship compared to others in his position.   Among other things, Plaintiff experienced material reductions in his: cell space, cell amenities, recreation time, recreation facilities, privacy, time for meals, amount of food, ability to use the shower, access to personal toiletries and cleaning products, social activities, participation in programming, access to the telephone, access to visits, receipt of mail, access to commissary, access to the library, access to television, and more.  He was placed in a housing area which had structural problems resulting in regular flooding when pipes leaked or fire sprinkler systems would randomly go on.

43.     Plaintiff further experienced atypical and severe restrictions because the food distribution system for the punitive segregation housing area was so poor,

Plaintiff was suddenly deprived of meals that allowed him to conform to his religion's requirements.   In addition, for some reason, from the time that Plaintiff entered punitive segregation, he was thereafter required to wear a prison jumpsuit to his court appearances, whereas he had previously been able to change into civilian clothes on such occasions.

44.    As a result of the rights violations herein described, Mr. Alli suffered religious discrimination, physical and psychological pain, humiliation, discomfort, head trauma, abrasions, lacerations and contusions, and more.

**Monell Allegations**

45.    All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to customs, policies and/or practices which the City maintains in furtherance, one supposes, of maintaining order in its correctional facilities.

46.    The manner in which the City adjudicates disciplinary allegations against inmates at Rikers Island does not work.  It is either corrupted by individuals who seek retaliatory or other objectives other than due process, for example, the manufacture by NYC DOC employees of false evidence to commence a proceeding against an individual inmate, then the adjudication captain's unwillingness to seriously test the charges by using fair procedures or by drawing reasonable conclusions from the facts

before them.  As exhibited by the allegations made in this complaint, Plaintiff sent

multiple reports to DOC and BOC Defendants and Warden Doe Defendant, drawing

their attention to the fact that he had suffered and continuing to suffer rights

violations as a result of Defendants' misconduct in using force against him, then

manipulating the disciplinary process to cover it up.  Plaintiff's allegations, as further

detailed above, also show that these Defendants, all of whom had the authority and

wherewithal to direct an investigation into Plaintiff's allegations, declined to do so.

Taken all of this together, Plaintiff's allegations amount to an assertion that

Defendant City—as shown by its Corrections policymaking officials' nonchalant

attitudes toward repeated written pleas of abuse—was deliberately indifferent to rights

violations of the sort complained of by Plaintiff.

47.    The aforesaid incident is not an isolated incident.  The existence of the

aforesaid unconstitutional customs and policies may be inferred from repeated

occurrences of similar wrongful conduct as documented in civil rights actions filed in

the United States District Courts in the Eastern and Southern Districts of New York

as well as in New York State courts, and as reported in the news and by organizations

from civil society.  See David Anthony Fullard, Supervision and Discipline of COs are

Key to Stopping Violence on Rikers Island, Sept. 18, 2014, at  http://www.truth-

out.org/news/item/26243-effective-supervision-and-rational-discipline-of-

corrections-officers-are-key-to-stopping-an-explosion-of-violence-on-rikers-island

(last accessed June 13, 2016); Norman Seabrook, <u>What's Really Wrong with Rikers</u>, Aug. 24, 2014, at http://www.nytimes.com/2014/08/25/opinion/whats-really-wrong-with-rikers.html?_r=0 (last accessed June 13, 2016); Michael Winerip and Michael Schwirtz, <u>Rikers: Where Mental Illness Meets Brutality in Jail</u>, July 14, 2014, at http://www.nytimes.com/2014/07/14/nyregion/rikers-study-finds-prisoners-injured-by-employees.html?_r=0 (last accessed June 13, 2016); Michael Schwirz, <u>Corruption Sweep at Rikers Island Leads to 22 Arrests</u>, June 24, 2014, at http://www.nytimes.com/2014/06/25/nyregion/2-officers-and-20-inmates-are-arrested-in-corruption-sweep-at-rikers-island.html?action=click&contentCollection=N.Y.%20%2F%20Region&module=RelatedCoverage&region=Marginalia&pgtype=article (last accessed June 13, 2016).

48.    In addition, the City is aware of this fact through less formal complaints made such as the ones described in this case, <u>i.e.</u>, an inmate's resort to administrative grievance procedures, Notices of Claim, complaints to the Board of Corrections, or complaints to 311.   On information and belief, the volume of such calls for investigation into rights violations is great.   Mr. Alli's experience represents but one individual's experience at the NYC DOC correctional facilities of the chronic fabrication of evidence and the chronic failure to provide meaningful process.

49.     Defendant City of New York and supervisory officials within its NYC DOC are thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights, for example, the use of unnecessary and/or excessive force to injury inmates and have failed to take sufficient steps to stop instances of excessive force from continuing.  By way of another example, Defendant City and its agents are also aware of the failings of the NYC DOC's failure to provide reliable due process protections to its charges.  In fact, the due process failures are so frequent and well known, inmates often do not even expect to receive due process, resulting in a culture that aggravates rights violations by fomenting individuals' apathy toward even trying to make robust use of that process. See First Report of the Nunez Independent Monitor, Nunez v. City of N.Y., No. 11 Civ. 5845 (LTS) (JCF), Docket No. 269 (May 31, 2016); see also Winnie Hu and Kate Pastor, Trial of 5 Rikers Guards Brings Out Culture of Violence at Jail, June 8, 2016 (reporting on allegations that officers assaulted inmate, then fabricated allegations that the inmate committed physical violence first), at

http://www.nytimes.com/2016/06/09/nyregion/trial-of-5-rikers-guards-brought-out-culture-of-violence-at-jail.html (last accessed June 13, 2016); Michael Schwirtz, Federal Monitors for Rikers Island Cite Progress and Violence, May 31, 2016, at

http://www.nytimes.com/2016/06/01/nyregion/federal-monitors-for-rikers-island-cite-progress-and-violence.html?action=click&contentCollection=N.Y.%20%2F%20Region&module=RelatedCoverage&region=Marginalia&pgtype=article (last accessed June 12, 2016).

50.     Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Mr. Alli's constitutional rights.

51.     Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that Individual Defendants named herein lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.  On information and belief, Defendant City of New York knew this because public records searches show that certain individual corrections officers implicated here have previously been the subjects of good faith inmate complaints. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train, supervise and discipline them.  For example, public dockets demonstrate that certain Defendants have had allegations of undue use of force brought against them in the past.

52.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

53.     All of the aforementioned acts deprived Mr. Alli of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

54.     Institutional failure to address Corrections Officers' violations of inmate rights amounts to constructive endorsement of the same and unwritten departmental policy that rights violations will be tolerated.  Institutional failure is demonstrated by Senior Officials, Policy-Making Officials, Supervisory Defendants, Investigators, the City and others' complicity through a failure to act to correct rights violations in a variety of ways.

55.     The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as corrections and law enforcement officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

56.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or

rule of the respective municipality/authority, which is forbidden by the United States Constitution.

57.    As a result of the foregoing, Mr. Alli is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

58.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

59.    Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

60.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

61.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
## First Amendment Retailiation

62.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

63.     Defendants violated Plaintiff's First Amendment rights.

64.     Plaintiff engaged in protected speech in response to Defendants' misconduct as described herein including, but not limited to, filing IGRPs, filing grievances with administrative deputies, defending himself robustly at his disciplinary hearings by identifying Defendants' inconsistencies and fabrications, and more. Furthermore, a fundamental allegation in this complaint is that the initial assault was Defendants' attempt to punish Plaintiff for being a party to a civil rights litigation in another context.

65.     Defendants took adverse action against Plaintiff including, but not limited to, falsely reporting him for misbehavior.  Plaintiff met with a wall of institutional resistance to hearing allegations of CO misconduct.

66.     There was often a causal connection between Plaintiff's protected speech and Defendants' adverse acts.  This connection can be reasonably inferred from the facts as described above.

67.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

68.     In addition, and in connection with the facts alleged herein, Plaintiff's right to practice his religion was denied through Defendants' refusal to reasonably accommodate his observation of a Ramadan fast.  The complete deprivation of breakfast food amounts to a significant, non-trivial burden on Plaintiff's rights under the Free Exercise Clause.

69.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
## Excessive Force

70.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

71.     Defendants violated the Fourth and Fourteenth Amendments because they used excessive force against Plaintiff without justification, causing him serious physical harm in the process.

72.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

73.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM
## Deliberate Indifference To Serious Medical Need

74.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

75.     Defendants violated Plaintiff's right under 42 U.S.C. § 1983 to be to be free from deliberate indifference to serious medical need.

76.     As discussed herein, Plaintiff's injuries after the assault were such that East Elmhurst Hospital doctors recommended medication and follow up treatment for his serious medical needs, which Defendants refused to provide and which needs, if unaddressed, were substantially likely to cause him serious physical harm.

77.     As alleged above, Plaintiff independently alerted Defendants on a regular basis that he needed medical attention for these serious medical needs, which requests Defendants ignored.

78.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

79.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## Due Process

21

80.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

81.    As described above, certain Individual Defendants arbitrarily imposed discipline upon Plaintiff which had the effect of depriving him of a liberty interest through random and unauthorized acts.

82.    As herein described, by way of example, Defendants provided Plaintiff with no process in the context of his disciplinary hearings.

83.    In imposing discipline upon Plaintiff without due process (none of which Plaintiff seeks to reverse, as he has already endured the consequences), these Defendants caused him to unjustifiably suffer an abrogation of a cognizable constitutional interest.  Plaintiff was a pretrial detainee and as such his liberty interest, even though admittedly abrogated due to the mere fact of his incarceration, was often greater than that of convicted inmates, not least because pre-trial detainees may not be punished.  Yet Defendants' random and unauthorized misconduct, even as they purported to provide Plaintiff with process, created unreasonably onerous prison conditions for Plaintiff as opposed (1) to other, similarly situated inmates, and (2) to what the law states is the minimum liberty restriction that a pre-trial detainee should have to endure as default conditions.

84.     For example, and as explained above, Plaintiff was subject to special housing restrictions, transportation protocols, visitation limitations and other restrictions as a result of Defendants' misconduct.   In addition, Plaintiff's already unjustifiably restricted existence was regularly subject to additional restriction when he was sent to punitive segregation while awaiting a disciplinary hearing or after an unjustifiable sentence for even more punitive segregation.

85.     With respect to the punitive segregation, although duration is not the only relevant factor to consider in terms of whether a pre-trial detainee has experienced an atypical and severe hardship while in custody, Plaintiff here had the unique—or perhaps common, as the Monell allegations of this lawsuit hold— experience of being regularly and lightly put through the disciplinary process on the basis of fabricated evidence.   In a system in which COs' misconduct becomes more and more regularized, as Plaintiff's experience was here, it is reasonable to infer that all of these transgressions, when taken together, demonstrate that Plaintiff suffered an experience that was different than the ordinary incidents of prison life, something akin to continuing violation doctrine in other legal contexts.

86.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

87.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## Cruel and Unusual Punishment (Through Due Process Clause)

88.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

89.     Pre-trial detainees like Plaintiff should be subjected to no punishment, yet Defendants subjected Plaintiff to cruel and unusual punishment when they assaulted him, causing him serious physical harm.

90.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

91.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## Failure to Intervene

92.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

93.     Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

94.     Accordingly, Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

95.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

96.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
## MONELL CLAIM

97.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

98.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

99.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYC DOC included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiff's rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its corrections officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

100.   The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYC DOC constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

101.   The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYC DOC were the direct and proximate cause of the constitutional violations suffered by Plaintiff as described herein.

102.   Unfortunately, the aforementioned inappropriate manner in which the City performs administrative justice—fabrication of evidence and arbitrary and random decisionmaking at disciplinary hearings—is common within the NYC DOC facilities at Rikers Island and other locations.  Individuals either perform retaliatory or

otherwise inappropriate acts outside the ends of justice, and the NYC DOC's administrative disciplinary procedures are tainted by a general, known, yet long-uncorrected culture that does not attach sufficient value to an individual's right to due process when accused of an infraction.

103.   The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  In addition, the City is aware of this fact through less formal actions taken such as the ones described in this case, i.e., Mr. Alli's complaints to the Board of Corrections, wardens and other officials.  Considering Mr. Alli's diligence in registering his complaints with these entities and people, the aggregate number of calls must be enormous and place the City on notice that corrective action is overdue to address the chronic fabrication of evidence and the chronic absence of meaningful process described in this pleading only by way of one individual's experience.  On information and belief, discovery of other like complaints would reveal impressive results.

104.   Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional

rights.  Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Mr. Alli's constitutional rights.

105.    Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.  Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train, supervise and discipline them.

106.    All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

107.    All of the aforementioned acts deprived Mr. Alli of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

108.    The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as NYC DOC employees, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

109.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

110.   As a result of the foregoing, Mr. Alli is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully request the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of their claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of the First, Fourth, Fifth, Eighth and Fourteenth Amendment rights of Plaintiff, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiff, the amount to be determined at jury trial, which Plaintiff respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:      November 9, 2016
            New York, New York

Ryan Lozar
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
Fax: 1-877-666-4456
ryanlozar@gmail.com

*Attorney for Plaintiff*